UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

CITIZENS AGAINST CASINO GAMBLING IN ERIE
COUNTY (Joel Rose and Robert Heffern, as
Co-Chairpersons), REV. G. STANFORD BRATTON,
D. MIN., NETWORK OF RELIGIOUS COMMUNITIES,
NATIONAL COALITION AGAINST GAMBLING EXPANSION,
PRESERVATION COALITION OF ERIE COUNTY, INC.,
COALITION AGAINST GAMBLING IN NEW YORK—
ACTION, INC., THE CAMPAIGN FOR BUFFALO—
HISTORY ARCHITECTURE AND CULTURE,
ASSEMBLYMAN SAM HOYT, MARIA WHYTE, Erie
County Legislator, JOHN MCKENDRY, SHELLEY
MCKENDRY, DOMINIC J. CARBONE, GEOFFREY D.
BUTLER, ELIZABETH F. BARRETT, JULIE CLEARY,
ERIN C. DAVISON, ALICE E. PATTON, MAUREEN
C. SCHAEFFER, DORA RICHARDSON, and
JOSEPHINE RUSH,

                    Plaintiffs,

v.                                                    **DECISION AND ORDER**
                                                      09-CV-291S

TRACIE STEVENS,[1] in her Official Capacity as Chairwoman
of the National Indian Gaming Commission, the
NATIONAL INDIAN GAMING COMMISSION, the
UNITED STATES DEPARTMENT OF THE INTERIOR,
KEN SALAZAR, in his Official Capacity as
the Secretary of the Interior, and BARACK OBAMA, in his
Official Capacity as President of the United States

                    Defendants.

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Tracie Stevens is substituted for Philip N. Hogen as the National Indian Gaming Commission's Chairperson.

1

## I.  INTRODUCTION

On March 31, 2009, Plaintiffs commenced this action challenging the legality of a gambling casino operated by the Seneca Nation of Indians ("SNI") in the city of Buffalo (the "Buffalo Parcel").  Their Motion for Summary Judgment, now before the Court, has been fully briefed by the parties and by *amicus* SNI.

This action is the third lawsuit commenced by largely the same plaintiffs, who have sought the same relief in their successive suits—*i.e.*, a declaration that Indian gaming in Buffalo is unlawful.  Each lawsuit alleges violations of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702 *et seq.,* and in each, the plaintiffs have claimed that certain decisions and actions by the defendants were arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

To persons familiar with these serial actions, many of the facts and legal principles discussed below will have a familiar ring; they relate to disputes addressed in  prior cases. To the extent new arguments and authority are presented in support of ongoing disputes, those matters are addressed herein.  In addition, one new and critical dispute has surfaced regarding the National Indian Gaming Commission's ("NIGC") approval of the SNI's new gaming ordinance.  Whereas the parties had agreed in prior suits that the SNI's Buffalo Parcel is subject to an IGRA prohibition against gaming on land acquired after October 17, 1988, that is no longer the case.  Defendants have revisited their interpretation of the statute, and now conclude that the IGRA prohibition does not apply to the Buffalo Parcel. Because the Court agrees that Defendants' revised interpretation comports with Congress's clear intent, Plaintiffs' motion is denied in its entirety, and this case is

dismissed.

## II.  BACKGROUND

### A.     The Relevant Statutory Provisions

Two statutes have been central to plaintiffs' claims—the Indian Gaming Regulatory Act ("IGRA"), under which gaming eligibility determinations are made, and the Seneca Nation Settlement Act of 1990 ("SNSA"), which permitted the SNI to acquire land to be held in restricted fee status.  A discussion of  the relevant provisions of each, in the context of the factual background of this case, is warranted.

#### 1.     *The IGRA*

Congress enacted IGRA in 1988 to establish a comprehensive statutory scheme governing gambling on Indian lands.  25 U.S.C. §§ 2701-2721.[2]  IGRA "seeks to balance the competing sovereign interests of the federal government, state governments and Indian tribes, by giving each a role in the regulatory scheme."  *Artichoke Joe's v. Norton*, 216 F. Supp. 2d 1084, 1092 (E.D. Cal. 2002), *aff'd*, 353 F.3d 712 (9th Cir. 2003), *cert. denied*, 543 U.S. 815, 125 S. Ct. 51, 160 L. Ed. 2d 20 (2004).

The statute provides for three classes of gaming on Indian land, each of which is subject to a different level of regulation.  § 2710.  The SNI has repeatedly sought to conduct class III gaming on the Buffalo Parcel.  This is the "most heavily regulated and most controversial form of gambling" under IGRA, *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 715 (9th Cir. 2003), and includes, *inter alia*, slot machines, games such as baccarat,  blackjack, roulette, and craps, and sport betting, parimutuel wagering

---

[2]  Unless otherwise noted, all subsequent statutory citations are to Title 25 of the United States Code.

and lotteries, § 2703(8) and (7)(B); 25 C.F.R. § 502.4. For class III gaming to be lawful: (1) the governing body of the tribe having jurisdiction over the "Indian land" on which it wishes to conduct its gambling operation must authorize class III gaming by adopting an "ordinance" or resolution; (2) the Chairman of the National Indian Gaming Commission ("NIGC" or "Commission") must approve the ordinance; (3) the state in which the "Indian land" is located must permit such gaming; and (4) the gaming must be conducted in conformance with a "tribal-state compact" that regulates such gaming. § 2710(d)(1).

In this case, as in the preceding cases, Plaintiffs maintain that the SNI does not have jurisdiction over the Buffalo Parcel; even if it does, the Parcel is subject to a statutory prohibition against gaming; and the Parcel does not fall within any exception to that prohibition. Two IGRA provisions are at the core of this dispute. First is the statute's definition of Indian lands as:

> (A) all lands within the limits of any Indian reservation; and
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or *held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power*.

§ 2703(4) (emphasis supplied). Next is section 20 of IGRA,[3] which provides, in pertinent part:

> **Gaming on lands acquired after October 17, 1988.**
>
> (a) **Prohibition on lands acquired in trust by Secretary**. Except as provided in subsection (b), gaming regulated by this Act shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after the date of enactment of this Act [enacted Oct. 17, 1988] unless— . . .

---

[3] Codified at § 2719.

4

(b) **Exceptions**.
 (1) Subsection (a) will not apply when--
   (A) the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or
   (B) lands are taken into trust as part of—
       (i) a settlement of a land claim,
       (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or
       (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition.

In its suits, the plaintiffs have challenged the applicability of these provisions to the Buffalo Parcel, which the SNI purchased in 2005 with funds it received through the Seneca Nation Settlement Act of 1990.

### 2.    *The SNSA*

For more than a century prior to SNSA's enactment, the SNI had leased land on its Allegany Reservation[4] to non-Indians. § 1774(a)(2)(A) and (B). The leases were primarily concentrated near railroad lines in the city of Salamanca and nearby villages. §§ 1774(a)(1) and 1774a(10). Prior to the SNSA's passage, the bulk of these land leases were for a term of ninety-nine years and were set to expire on February 19, 1991. §§ 1774(a)(2)(C) and (4).

In 1969, the New York State legislature created the Salamanca Indian Lease Authority ("SILA") as a public benefit corporation authorized to negotiate and enter into a new lease with the SNI for all leased reservation lands underlying the city. N.Y. PUB. AUTH.

---

[4] The SNI has three reservation areas in western New York State, Allegany, Cattaraugus, and Oil Spring. § 1774a(7).

LAW §§ 1790-99.  Approximately twenty years of lease negotiations ensued, and finally concluded in May 1990.  Fluent v. Salamanca Indian Lease Authority, 847 F. Supp. 1046, 1049-50 (W.D.N.Y. 1994).  A condition of the lease renewal agreement was that the federal and state governments agree to pay to the SNI a total of $60 million, an amount believed to approximate the difference between the rents the SNI had actually received over the previous 99 years and the fair market rental value of the leased land over that same time period.  The federal government was asked to pay $35 million, and the state government $25 million.  Id. at 1050; see also, S. REP. NO. 101-511, at 23 (1990).  Both governments agreed to do so, and Congress passed "An Act to provide for the renegotiation of certain leases of the Seneca Nation, and for other purposes," 104 Stat. 1292 (1990), to which it assigned the short title "Seneca Nation Settlement Act of 1990."

The SNSA requires that the SNI use five million dollars of the United States' payment for economic and community development.  Id. § 1774d(b)(2).  The bulk of the payment—$30,000,000—was to be "managed, invested, and used . . . as determined by the Nation in accordance with [its] Constitution and laws . . . ."  Id. § 1774d(b)(1).  The SNSA permits the SNI to acquire with SNSA funds land that is "within its aboriginal area in the State [of New York] or situated within or near proximity to former reservation land."  Id. § 1774f(c) (alteration added).

> State and local governments shall have a period of 30 days after notification by the Secretary or the Seneca Nation of acquisition of, or intent to acquire such lands to comment on the impact of the removal of such lands from real property tax rolls of State political subdivisions.  Unless the Secretary determines within 30 days after the comment period that such lands should not be subject to the provisions of section 2116 of the Revised Statutes (25 U.S.C. 177), such lands shall be subject to the provisions of that Act and shall be held in restricted fee status by the Seneca Nation.  Based on the

proximity of the land acquired to the Seneca Nation's reservations, land acquired may become a part of and expand the boundaries of the Allegany Reservation, the Cattaraugus Reservation, or the Oil Spring Reservation in accordance with the procedures established by the Secretary for this purpose.

*Id.* Land that is held in restricted fee status cannot be sold, leased, or otherwise conveyed without the approval of the federal government. § 177.

### 3. *Intersection of the IGRA and SNSA*

On August 18, 2002, the SNI and the State of New York executed a Tribal-State Gaming Compact (the "Compact") for the conduct of class III gaming at three locations in New York State, one of which was a then-unidentified site to be purchased in the city of Buffalo. The Compact reflects the SNI's intent to use funds it received under SNSA to purchase that land.

Once signed, gaming compacts are forwarded to the Interior Secretary, who may approve, disapprove or take no action on it. § 2710(d)(8). "If the Secretary does not approve or disapprove a compact [within] 45 days after the date on which the compact is submitted to the Secretary for approval, the compact shall be considered to have been approved by the Secretary, but only to the extent the compact is consistent with [IGRA]." § 2710(d)(8)(c).

In this particular instance, the Compact was deemed approved by virtue of then-Secretary Norton's decision not to approve or disapprove it. In a letter to the SNI, Norton opined that land to be purchased with SNSA funds would be "Indian lands" within the meaning of IGRA, and would fall within the "settlement of a land claim" exception to IGRA's general prohibition on gaming on lands acquired after 1988. (Docket No. 58-21 at 6-7.)

7

The Secretary nonetheless declined to affirmatively approve the Compact because of policy concerns over its likely impact on the proliferation of off-reservation gaming development.  (*Id*. at 2.)  The SNI went on to purchase the Buffalo Parcel, consisting of approximately 9 acres, in October 2005.  It gave notice to the State of New York and local governments in accordance with §1774f(c), and the Parcel assumed restricted fee status by operation of law on December 2, 2005.

## B.    Procedural Background

### 1.    *The Prior Lawsuits*

The plaintiffs' first lawsuit, filed in January 2006, challenged former-Secretary Norton's conclusions that the Buffalo Parcel was "Indian lands" which fell within the "settlement of a land claim" exception, and also the NIGC Chairman's 2002 decision to approve the SNI's ordinance.  *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 06-CV-00001-WMS (*CACGEC I*).   In January 2007, the Court found no indication in the record that the NIGC Chairman had considered the threshold jurisdictional question of whether a future land purchase made with SNSA funds would be gaming-eligible Indian lands.[5]  The Court vacated the NIGC Chairman's decision to approve the SNI's gaming ordinance, and remanded so that NIGC could address whether the Buffalo Parcel is gaming-eligible Indian land under IGRA.  471 F. Supp. 2d 295, 326-27 (W.D.N.Y. 2007), *amended in part on reconsideration*, 2007 U.S. Dist. LEXIS 29561 (W.D.N.Y. Apr. 20, 2007).

Thereafter, in July 2007, the Chairman concluded that the Buffalo Parcel is gaming

---

[5]  There was no indication in the administrative record that the Chairman was aware of and considered Secretary Norton's 2002 opinion in this regard, or that he independently took up the question.

eligible Indian land, and he approved an amended ordinance the SNI had enacted on June 9, 2007. The plaintiffs commenced their second lawsuit on July 12, 2007, urging that the Buffalo Parcel is not "Indian country" over which the SNI has jurisdiction and, even if it were, the Parcel does not fall within the settlement of a land claim exception to the general prohibition against gaming on newly acquired land. *Citizens Against Casino Gambling in Erie County v. Hogen*, 07-CV-00451-WMS (*CACGEC II*). Here, the Court concluded the Buffalo Parcel is Indian country, but is not gaming eligible land.[6] Therefore, it again vacated the NIGC Chairman's approval of the SNI's ordinance. 2008 U.S. Dist. LEXIS 52395, at *209 (W.D.N.Y. July 8, 2008).[7]

## 2.    *The IGRA Regulatory Process*

IGRA provides that NIGC "shall promulgate such regulations and guidelines as it deems appropriate to implement the provisions of [25 U.S.C. §§ 2701-19]." §2706(b)(10). In 1992 and 1993, the Commission published regulations establishing certain definitions, requirements, and procedures relative to the conduct of gaming under IGRA.[8] 25 C.F.R. Chapter III, Parts 501-99.

Several years later, in 2000, the Bureau of Indian Affairs ("BIA") published a proposed rule to establish "procedures an Indian tribe must follow in seeking a Secretarial determination [under § 2719(b)(1)(A)]" that a gaming establishment on newly acquired land

---

[6] As noted, the parties agreed, in *CACGEC II*, that land purchased after 1988 and held in restricted fee status was subject to the section 20 prohibition on gaming.

[7] Both *CACGEC I* and *CACGEC II* are with the Second Circuit on appeal. Defendants moved to stay the appeals until final judgment is entered in the current action. That motion was granted on March 12, 2010.

[8] 57 Fed. Reg. 12382 (Apr. 9, 1992) (definitions); 58 Fed. Reg. 5802, 5818 (Jan. 22, 1993) (requirements and procedures).

would be in the best interest of the tribe and its members, and would not be detrimental to the surrounding community.  65 Fed. Reg. 55471 (Aug. 25, 2000).  Comments on the proposed rule were permitted until November 13, 2000, and later reopened and extended until March 27, 2002.  66 Fed. Reg. 66847 (Dec. 27, 2001); 67 Fed. Reg. 3846 (Jan. 28, 2002).  Thereafter, the proposal lay dormant for several years.

On October 5, 2006, the BIA published an amended proposed rule, with the expanded purpose of setting out "procedures that the Department of the Interior will use to determine whether class II or class III gaming can occur on land acquired in trust for an Indian tribe after October 17, 1988."  71 Fed. Reg. 58769, 58772 (Oct. 5, 2006).  The BIA explained it was "publishing a new proposed rule because [it] determined that the rule should address not only the exception contained in Section 20(b)(1)(A) of IGRA (Secretarial Determination), but also the other exceptions contained in Section 20 [*i.e.*, settlement of a land claim, initial reservation, and restored lands], in order to explain to the public how the Department interprets these exceptions."  *Id*. at 58770.  The deadline for comments was twice extended and expired on February 1, 2007.  71 Fed. Reg. 70335 (Dec. 4, 2006); 72 Fed. Reg. 1954 (Jan. 17, 2007).  The final rule was published on May 20, 2008, and took effect on August 25, 2008.  73 Fed. Reg. 29354 (May 20, 2008); 73 Fed. Reg. 35579 (June 24, 2008).  The final regulations reflect DOI's revised interpretation of IGRA's section 20.

### 3.    *The Instant Lawsuit*

After *CACGEC II* was decided and the new regulations became effective, the SNI submitted to NIGC a second amended gaming ordinance for the Buffalo Parcel.  In a letter

10

dated November 14, 2008, NIGC's Acting General Counsel advised DOI of the submission and made the following request:

> We understand that DOI believes the new interpretation [of section 2719] complies with the plain meaning of the statute and agree with that position. However, if the Chairman is to approve the Nation's gaming ordinance on the grounds that section 2719 does not apply to restricted fee land, he must provide a reasoned analysis for this new interpretation.  A description of DOI's policy reasons for the change will assist the Chairman in providing that analysis.

(Docket No. 58-38, BIA-AR000034.)  In response, DOI forwarded to NIGC a Solicitor's M-Opinion, M-37023, dated January 18, 2009, which acknowledged that the new regulations were a departure from the DOI's prior position on restricted fee lands, and discussed reasons for that change of position.  (Docket No. 58-8.)  Two days later, on January 20, 2009, the NIGC Chairman approved the SNI's ordinance, affirming "NIGC's intent to follow the regulations, including the interpretation that excludes restricted lands from the general prohibition of gaming on after acquired lands." (Docket No. 58-4 at 5.)  The Chairman went on to conclude that the Buffalo Parcel, held in restricted fee, is not subject to section 20's after-acquired land prohibition at all and, even if it were, the Buffalo Parcel was acquired as part of the settlement of a land claim and would be excepted from the prohibition. (Docket No. 58-4.)

The instant lawsuit followed, and Plaintiffs challenge the Buffalo Parcel's status as Indian lands, the validity of the new regulations, and the NIGC's ordinance approval.  In their three claims for relief, Plaintiffs maintain that: 1) the Parcel is not Indian country and does not fall within IGRA's definition of Indian lands; 2) even if it were Indian land, it is subject to IGRA's prohibition against gambling on newly acquired land; and 3) the Parcel's acquisition does not qualify for the settlement of a land claim exception.

11

On June 15, 2009, Defendants moved to dismiss the first claim, which Plaintiffs supported by way of three discrete arguments.  On March 30, 2010, the Court granted Defendants' motion in part.[9]  Thereafter, Defendants answered the remaining claims and filed certified administrative records from NIGC and DOI.

## III.  DISCUSSION

**A.     Applicable Legal Standards**

### 1.     *The Summary Judgment Standard*

When deciding a motion for summary judgment under Rule 56, the court must draw all justifiable inferences from the record in favor of the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Vann v. City of New York*, 72 F.3d 1040, 1048-49 (2d Cir. 1995).  Summary judgment will be granted when the moving party demonstrates that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  While a material question of fact is to be reserved for a jury, questions of law are appropriately decided on a motion for summary judgment.  *Scott v. Harris*, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

Where, as here, the moving party "seeks review of agency action under the APA, the district judge sits as an appellate tribunal. The 'entire case' on review is a question of

---

[9]  The Court dismissed Plaintiffs' first and second arguments which urged that the Buffalo Parcel is not Indian land because: 1) the SNSA is unconstitutional, and 2) the Compact between the SNI and State of New York, which was deemed approved in 2002, did not authorize gambling on land that had not yet been purchased.

law." *Am. Bioscience, Inc. v. Thompson*, 348 U.S. App. D.C. 77, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (citations omitted).  More specifically, "[t]he question whether an agency's decision is arbitrary and capricious . . . is a legal issue." *Connecticut v. United States DOC*, 04cv1271, 2007 U.S. Dist. LEXIS 59320, at *2 (D. Conn. Aug. 15, 2007).  Thus, in the agency review context, Plaintiffs' claims that Defendants acted in an arbitrary and capricious manner, or made determinations that are contrary to law, are legal questions that can be resolved on review of the agency record and/or the governing statutes, regardless of whether the questions are presented in the context of a motion to dismiss or in a motion for summary judgment.  *University Med. Ctr. v. Shalala*, 335 U.S. App. D.C. 322, 173 F.3d 438, 441 n.3 (D.C. Cir. 1999) (citations omitted).

## 2.    *APA Review of Agency Action*

The APA provides that a reviewing court must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a).

When a court is asked to review an agency's construction of the statute it administers, its review is guided by the principles announced in *Chevron, U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984).  The Supreme Court has directed that a court must first employ "traditional tools of statutory construction" to determine whether Congress has expressed its intent on the question before the court.  *Id*. at 842, n.9.

> If the intent of Congress is clear, that is the end of the matter; for the Court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply

impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress. If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Id.* at 842-43; *accord*, *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 683 n.5 (2d Cir. 2012) (because statute is unambiguous, court need not rely on agency's implementing regulations).

A unique canon of construction applies to statutory provisions involving Indians. Under this canon, "[s]tatutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S. Ct. 2399, 85 L. Ed. 2d 753 (1985); *Connecticut ex rel. Blumenthal v. United States DOI*, 228 F.3d 82, 92 (2d Cir. 2000). Absent ambiguity, however, this canon cannot be used to expand upon or disregard the clear intent of Congress. *Negonsott v. Samuels*, 507 U.S. 99, 110, 113 S. Ct. 1119, 122 L. Ed. 2d 457 (1993) (citing *South Carolina v. Catawba Indian Tribe, Inc.*, 476 U.S. 498, 506, 90 L. Ed. 2d 490, 106 S. Ct. 2039 (1986)).

**B.      Plaintiffs' First Claim**

In what remains of their first claim for relief, Plaintiffs allege that the Buffalo Parcel is neither "Indian country" nor "Indian lands."

### 1.      *The Buffalo Parcel is Indian Country*

Indian country is defined as:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151.  "Generally speaking, primary jurisdiction over land that is Indian country rests with the Federal Government and the Indian tribe inhabiting it, not with the States." *Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1, 118 S. Ct. 948, 140 L. Ed. 2d 30 (1998) (citation omitted); *see also, Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 498 U.S. 505, 509, 511, 111 S. Ct. 905, 112 L. Ed. 2d 1112 (1991) (tribes are "domestic dependent nations" that have inherent sovereign authority over their members and the Indian country that is validly set apart for their use).

In *CACGEC II*, the parties agreed that tribes have territorial authority over "Indian country," and that territorial jurisdiction must exist before a tribe can validly exercise its governmental power over the land.  Plaintiffs had maintained that the Buffalo Parcel is not "Indian country," and Defendants urged that it is.  After considering the parties' extensive arguments, the Court concluded that the Buffalo Parcel is "Indian country," such that the SNI has primary jurisdiction over the land.

15

When Plaintiffs set out the same allegations here, Defendants moved to dismiss based on collateral estoppel and *res judicata*.  The Court concluded Defendants had not met their burden of demonstrating that the claim is barred by *res judicata*.  Collateral estoppel does not apply because the appellate stay Defendants procured prevents Plaintiffs from obtaining review of the *CACGEC II* decision until this current case ends. (Docket No. 21 at 14-18.)   Plaintiffs now maintain that, the Court's prior decision notwithstanding, they are entitled to summary judgment on this issue.

While the Court was compelled to conclude that Plaintiffs are now positioned to take another bite at this apple, that fact alone is not reason to address arguments and authority already fully considered.  For example, Plaintiffs recycle arguments and case law they presented in *CACGEC II* in support of their ongoing contention that, in enacting SNSA, Congress did not intend to transfer to the SNI primary jurisdiction over land it might purchase with SNSA funds.  (Docket No. 58-2 at 40-47.)  All such repetitive arguments are rejected for the reasons fully stated in *CACGEC II*.

Plaintiffs do offer one new case in support of their argument that sovereignty does not rest in the SNI.  They cite *Hawaii v. Office of Hawaiian Affairs,* a 2009 United States Supreme Court decision, for the proposition that a congressional transfer of sovereignty must be express, not inferred or implied.  556 U.S. 163, 129 S. Ct. 1436, 173 L. Ed. 2d 333.  The case involved a joint resolution of Congress which, *inter alia*, "apologized" to Native Hawaiians for the overthrow of the Kingdom of Hawaii and "acknowledged" the resultant suppression of the inherent sovereignty of the Native Hawaiian people.  *Id*. at 168-69.  The Hawaii State Supreme Court found that Congress had thereby divested

16

Hawaii of its sovereign authority to sell or transfer public lands until potential native claims to the land were resolved.  The United States Supreme Court reversed, finding that the resolution's conciliatory and precatory terms were "not the kind that Congress uses to create substantive rights–especially those that are enforceable against the co sovereign States."  *Id*. at 173.

Plaintiffs have made no attempt to reconcile the conciliatory language at issue in *Hawaii* with the SNSA's directive terms, which authorize payment to the SNI, permit the Nation to use funds to acquire land, and provide an avenue for the land to be placed under governmental protection against alienation and removed from state and local tax rolls.  This Court found, in *CACGEC II*, that the SNSA does precisely what Plaintiffs contend is required; it expresses an intent to transfer sovereignty to the SNI in language mirroring that of other statutes that have been found to effect such transfers.  2008 U.S. Dist. LEXIS 52395, at *141-48.  Plaintiffs point to nothing in *Hawaii* that warrants revising that conclusion.

The two additional cases Plaintiffs cite in their reply brief reinforce, rather than call into question, the *CACGEC II* conclusion on this issue.  The SNI has jurisdiction over the Buffalo Parcel because Congress expressly provided for transfer, after giving the state and local governments opportunity to comment.  *See Miami Tribe of Oklahoma v. United States,* 656 F.3d 1129, 1145 (10th Cir. 2011) (jurisdiction is established by federal authority and derives from the will of Congress).  Conversely, where no expression of congressional intent or purpose exists, a tribe cannot establish jurisdiction through its unilateral actions.  *See Oklahoma v. Hobia*, 2012 U.S. Dist. LEXIS 100793 (July 20, 2012) (landless Kialagee

Tribal Town did not obtain jurisdiction over a restricted allotment owned by members of the Muscogee Nation through unilateral act of leasing the land).

Plaintiffs next urge the Court to take another look at its prior Indian country analysis because "the administrative record reflects that DOI [now] views the definition of 'Indian country' to be irrelevant to the definition of 'Indian lands.'" (Docket No. 58-2 at 47 (citing Docket No. 58-38, BIA-AR000500; 73 Fed. Reg. 29354, 29357).)  From there, they conclude that the Court's Indian country analysis in *CACGEC II* was neither necessary to, nor dispositive of, the question of jurisdiction over the Buffalo Parcel.  This argument mischaracterizes the administrative record.  Defendants consistently have stated that there is a two-step process to determine whether restricted fee land is "Indian lands" within the meaning of IGRA.  The initial inquiry is whether the tribe has territorial jurisdiction over the land, and the "Indian country" analysis is directed to this question.  The next inquiry involves the tribe's relationship to the land.  "Indian country" held by a tribe in restricted fee is not "Indian lands" for purposes of IGRA unless the tribe actually asserts its governmental power over the land.[10]

In support of their argument that DOI has changed its view on the import of the "Indian country" analysis, Plaintiffs point to its refusal to adopt 18 U.S.C. § 1151's definition of reservation in its section 20 regulations.  (Docket No. 58-2 at 47-48.)  But one need only look to section 20's purpose to understand that Plaintiffs' argument lacks merit.  As noted, Defendants consider the "Indian country" analysis central to the question of jurisdiction.

---

[10]  As former-Secretary Norton observed in her 2002 letter to the SNI, "the Nation will have jurisdiction over these parcels [to be purchased with SNSA funds] because they meet the definition of 'Indian country' under 18 U.S.C. § 1151" and they "will come within the definition of 'Indian lands' in IGRA [only] if the Nation exercises governmental power over them."  (Docket No. 58-21 at 6.)

IGRA's section 20, however, does not come into play until <u>after</u> tribal jurisdiction has been established <u>and</u> it is determined that the land in question is "Indian lands" for purposes of IGRA.

One question addressed under section 20 is whether, for purposes of gaming eligibility, a newly acquired parcel of trust land (over which a tribe necessarily has jurisdiction) is within, or contiguous to the tribe's *reservation* boundaries as they existed on October 17, 1988. § 2719(a)(1).   Because there is no need to revisit the question of jurisdiction to make this geographic determination, DOI found no need to reference or incorporate 18 U.S.C. § 1151's definition of reservation.  In short, the statements Plaintiffs' point to are unrelated to the subject of jurisdiction and do not represent a change in position.

Finally, in their reply, Plaintiffs urge that the Supreme Court's decision in *City of Sherrill v. Oneida Indian Nation of N.Y.*, 544 U.S. 197, 125 S. Ct. 1478, 161 L. Ed. 2d 386 (2005), "effectively uncouples the Indian country issue from the jurisdiction question." (Docket No. 65 at 8-9.)  The Court disagrees.  *City of Sherrill* involved various parcels of city land purchased by the Oneida Nation in the late 1990s.  The parcels were within the tribe's historic reservation area, but last possessed by the tribe in 1805.  544 U.S. at 202. The Oneidas refused to pay property taxes, claiming sovereignty over the reacquired parcels, and the district court concluded the parcels were not taxable.  The Second Circuit affirmed, ruling that the land had been set aside by treaty for the Oneida's use, and Congress had not since acted to diminish or disestablish that reservation.  Therefore, the parcels qualified as "Indian country" under 18 U.S.C. § 1151.  *Id*. at 212; *see also*, *Solem*

*v. Bartlett*, 465 U.S. 463, 471, 79 L. Ed. 2d 443, 104 S. Ct. 1161 (1984) ("Once a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise.").

Significantly, the Supreme Court did not disturb the Second Circuit's conclusion that a historic reservation that was never disestablished remains "Indian country," but it did reverse on other grounds.  The Court found that the reestablishment of Indian sovereign control over land that had undergone significant development in the intervening centuries, had been part of the tax base throughout, and was located in an area populated overwhelmingly by non-Indians, "would have disruptive practical consequences" that rendered a shift in governance inequitable.  *Id*. at 221.  There is nothing in this holding that signals a *carte blanche* rejection of the long established relationship between "Indian country" and tribal jurisdiction.  Rather, the decision suggests that the facts of a particular case and equitable principles are properly considered where, though jurisdiction historically remains with a tribe, it has not occupied the land or exercised governmental authority over it for centuries.  This result is a far cry from "effectively uncoupling" the Indian country definition from the jurisdictional question in all instances.

For the reasons stated, the Court finds there is no need to revisit the necessity for, our outcome of, the *CACGEC II* Indian country analysis.  The Court previously concluded that the Buffalo Parcel is sovereign territory, and after considering Plaintiffs' new arguments, it confirms that holding today .

## 2.    *The Buffalo Parcel is Indian Lands*

As discussed above, Plaintiffs previously challenged the Buffalo Parcel's status as "Indian lands" based solely on their assertion that SNSA did not transfer primary jurisdiction to the SNI.  Here, they advance a new argument and urge that a historical understanding of how trust and restricted fee lands came to exist compels but one conclusion; Congress "inten[ded] to limit Indian gambling [to] lands that were subject to aboriginal jurisdiction as of the enactment of IGRA."  (Docket No. 58-2 at 40.)

The history of Indian land holdings was discussed in detail in *CACGEC II*, and is summarized here for the convenience of those who may be unfamiliar with the prior cases. Early in America's history, Native Americans, through treaty negotiations, relinquished vast territories to the United States or the States.  Some tribes retained reserved land within their aboriginal territory, others were removed westward to new land in exchange for their aboriginal holdings.  Statutes enacted during this period understood "Indian lands" to include lands that tribes may cede to the United States by treaty. § 152, 5 Stat. 135 (1837).

In the latter 1800s, there was a shift in U.S. policy.  The government abandoned treaty making in favor of allotment and assimilation.  Under the General Allotment Act of 1887, tribe members gave up their ownership interest in commonly held reservation land for an individual land allotment that either was held by the government in "trust" for the Indian, or by the Indian in "restricted fee."  §§ 331 *et seq.*, 24 Stat. 388.  The land remained in trust or restricted status for a specified number of years, after which the government conveyed it to the individual by fee patent, without restriction on alienation.  *Id*.  Statutes enacted thereafter recognized this new form of "Indian lands," in addition to those

previously recognized.   § 231, 45 Stat. 1185 (1946) (tribal lands, reservations, and allotments therein); § 319, 31 Stat. 1083 (1901) (reservations, lands held by tribe in Indian territory, allotments which have not been conveyed to the allottee with full power of alienation).

The allotment policy persisted until 1934, when Congress passed the Indian Reorganization Act ("IRA") .  §§ 461 *et seq.*, 48 Stat. 984.  Among other things, the IRA was directed toward stemming the loss of Indian land that had resulted from allotment. The statute put an end to the granting of allotments, § 461, extended indefinitely all existing periods of trust or restriction on remaining allotments, § 462, and authorized the Secretary to restore surplus lands to tribal ownership, § 463, permit the transfer of restricted Indian lands to the tribe, § 464, and acquire land in the name of the United States in trust for an Indian tribe or individual Indian, § 465.  A number of statutes enacted after the IRA include a definition of "Indian lands" quite similar to IGRA,  § 81, 114 Stat. 46 (2000); § 407d, 70 Stat. 721 (1956); § 1680n, 106 Stat. 4589 (1992).

Plaintiffs now urge that, by including non-reservation trust and restricted fee lands in IGRA's "Indian lands" definition, Congress was necessarily referring to historical land holdings and thereby intended to limit gaming to lands over which tribes had "aboriginal" or "preexisting"[11] jurisdiction at IGRA's enactment. (Docket No. 58-2 at 40.)  In short, the "Indian lands" definition itself prohibits gaming on land acquired after IGRA's passage.

The Court is not persuaded for the simple reason that "trust lands" clearly are not

---

[11]  Plaintiffs use both of these terms in their brief.  When IGRA was enacted, tribes may have had "preexisting" jurisdiction over land that was not part of their "aboriginal" territory.  This analysis applies to either circumstance.

limited to historical allotments.  To the contrary, the IRA's trust provision remains the long standing method by which new lands, both on and off reservation, are acquired for the benefit of Indians.  As Defendants and *amicus* correctly observe, Plaintiffs' interpretation would render at least a portion of IGRA superfluous.  *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 111 S. Ct. 2631, 115 L. Ed. 2d 764 (1991) (expressing "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment"); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S. Ct. 1811, 100 L. Ed. 2d 313 (1988) (courts look to the statutory language at issue as well as the language and design of the statute as a whole).  Section 20 expressly prohibits gaming on lands acquired by the Secretary in trust after October 17, 1988.  § 2719(a).  If, as Plaintiffs maintain, Congress intended the term "Indian lands" to itself prohibit gaming on trust lands acquired after IGRA's enactment, the section 20 prohibition serves no purpose.

Plaintiffs also point to *Carcieri v. Salazar* in support of their argument that Congress intended to take a purely historic view of "Indian lands."  555 U.S. 379, 129 S. Ct. 1058, 172 L. Ed. 2d 791 (2009).  In that case, the State of Rhode Island challenged the Secretary's authority to accept into trust a 31-acre parcel of land adjacent to the Narragansett tribe's existing land.[12]  The IRA permits the Secretary to accept land into trust for "the purpose of providing land for Indians." § 465.  At issue was the meaning of § 479, which defines the term "Indian" as "all persons of Indian descent who are members of any recognized Indian tribe *now under Federal jurisdiction*." (emphasis added.)  The Supreme Court was asked to decide whether the term "now under Federal jurisdiction" referred to

---

[12]  The existing land had been acquired by statute, in settlement of a suit in which the tribe alleged its territory was misappropriated in violation of the Non-Intercourse Act, § 177.  *Id.* at 384.

1934, when Congress enacted the IRA, or 1998, when the Secretary accepted the 31 acres into trust. *Id*. at 388. The Court concluded that the word "now" in § 479 unambiguously "limits the Secretary's trust authority under § 465 to those members of tribes that were under federal jurisdiction at the time the IRA was enacted." *Id*. at 391. Because the Narragansett tribe was neither federally recognized nor under the jurisdiction of the federal government in 1934, the Secretary was without authority to accept land into trust on its behalf. *Id*. at 395-396.

Plaintiffs do not attempt to explain *Carcieri*'s relevance to IGRA's definition of "Indian lands." They point to no limiting language in § 2703(4)—such as "now," "presently," "aboriginal," or "preexisting"—to support their assertion that only lands that were under tribal governance on October 17, 1988 can qualify as "Indian lands." To the contrary, the definition is written entirely in the present tense and it expansively includes "all" and "any" lands falling within the categories specified.

For fee land to qualify as "Indian lands," it need only be "held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." § 2703(4). Thus, the Court rejects Plaintiffs' contention that land meeting this criteria is not "Indian lands" simply because it was acquired after 1988.

As was the case in *CACGEC II*, Plaintiffs do not contest the NIGC's finding that, since purchasing the Buffalo Parcel, the SNI has exercised its tribal governmental authority over the land. Accordingly, as in *CACGEC II*, Plaintiffs have offered no basis upon which the Court can conclude that the Parcel is not "Indian lands" within the meaning of IGRA.

**C.    The Buffalo Parcel is Gaming Eligible**

The fact that land acquired after 1988 may qualify as "Indian lands" does not mean that the land is gaming eligible.   IGRA's section 20 sets forth circumstances in which gaming on newly acquired land is prohibited, and the meaning and scope of its provisions are now at issue.   In their second claim, Plaintiffs urge that, even assuming the Buffalo Parcel is Indian lands, it is subject to section 20's prohibition against gaming on lands purchased after October 17, 1988.

Section 20 states, in pertinent part:

(a) Prohibition on lands acquired in trust by Secretary
Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary *in trust* for the benefit of an Indian tribe after October 17, 1988, unless—

§ 2719(a) (emphasis added).  Defendants maintain that the plain language of this provision limits the prohibition to trust lands only, and so it does not apply to the Buffalo Parcel.

This dispute is a matter of first impression.   In *CACGEC II* the parties agreed that, notwithstanding the prohibition's specific reference to "trust" lands, Congress intended that it would also apply to newly-acquired restricted fee lands such as the Buffalo Parcel. Former-Secretary Norton had set out the DOI's reasoning, with which Plaintiffs concurred, in a 2002 letter to the SNI:

Section 20 of IGRA, 25 U.S.C. § 2719 contains a general prohibition on gaming on lands acquired in trust by the Secretary for the benefit of an Indian tribe after October 17, 1988, unless one of several statutory exceptions is applicable to the land.  Under the Compact, the Nation plans to use the provisions of the Settlement Act to acquire the land in restricted fee, rather than in trust.  The Department has examined whether Section 20 of IGRA applies to the Compact.  We have reviewed whether Congress intended, by using the words "in trust" in Section 20 of the IGRA, to completely prohibit gaming on lands acquired in restricted fee status by an

Indian tribe after October 17, 1988.  I cannot conclude that Congress intended to limit the restriction on gaming on after-acquired land to only *per se* trust acquisitions.  The Settlement Act clearly contemplates the acquisition of Indian lands which would otherwise constitute after-acquired lands.  To conclude otherwise would arguably create unintended exceptions to the Section 20 prohibitions and undermine the regulatory regime prescribed by IGRA.  I believe that lands held in restricted fee status pursuant to an Act of Congress such as is presented within this Compact must be subject to the requirements of Section 20 of IGRA.

(Docket No. 58-21 at 6-7.)  The NIGC also adopted this view when it approved the SNI's amended gaming ordinance.

The BIA's proposed regulations, published on October 5, 2006, adhered to the same interpretation:

§ 292.4 What criteria must trust land meet for gaming to be allowed under the exceptions listed in 25 U.S.C. 2719(a) of IGRA?

(a) For class II or class III gaming to be allowed on trust *or restricted fee land* under section 2719(a)(1) of IGRA, the land must either:

(1) Be located within or contiguous to the boundaries of the reservation of the tribe on October 17, 1988; or

(2) Meet the requirements of paragraph (b) of this section.

71 Fed. Reg. 58769, 58773 (emphasis supplied).  Defendants continued to advance this position, and did not deviate from it, in litigating *CACGEC II*.[13]

The only opposition to this view appeared in the SNI's *CACGEC II amicus* brief.  The Nation urged that IGRA must be interpreted in accord with its plain text, which compels the conclusion that Congress intended the section 20 prohibition to apply only to trust lands.  But, as was noted earlier in *CACGEC II*, absent exceptional circumstances, *amicus curiae* cannot implicate issues not presented by the parties.  471 F. Supp. 2d 295, 311

---

[13]  The action was commenced on July 12, 2007, and closed on July 8, 2008.

(W.D.N.Y. 2007).  The Court accepted the parties' unified position that the term "in trust," as used in the section 20 prohibition, included both trust and restricted fee land.  Because the parties were in accord on this issue and the SNI did not argue exceptional circumstances, any  discussion of this issue in *CACGEC II* is necessarily *dicta.*

While Defendants did not put this issue into dispute in *CACGEC II*, it did alter its position during the pendency of that litigation.  During that time, the BIA removed all reference to restricted fee land from its final regulations, published May 20, 2008, and stated its revised position that section 20, by its plain language, applies only to lands held in trust.  73 Fed. Reg. 29354, 29355-56.

Now that section 20's meaning is squarely at issue, Plaintiffs urge that congressional intent is clear, and the Court need not go beyond *Chevron's* step one to confirm that, as the parties agreed in *CACGEC II*, IGRA generally prohibits gaming on all newly acquired Indian land.  They further maintain that, even were the statute ambiguous, neither the DOI's nor the NIGC's new interpretation is entitled to deference.

Defendants, too, argue that congressional intent is clear, but they reach the opposite conclusion—that the section 20 prohibition applies to trust land only.  And, they contend, even assuming ambiguity, their revised interpretation is a reasonable construction of the statute.  In this regard, the NIGC Chairman concluded that his "new interpretation is superior and entitled to deference" because the change "presently only affects one tribe," and the new reading conforms to the plain language of the statute, resolves any ambiguity in favor of Indian tribes, and "frees restricted land from section 2719's prohibition, thus promoting, rather than inhibiting, IGRA's objective to encourage tribal economic

development."  (Docket No. 58-4 at 12, 18-19.)

To answer questions of congressional intent, *Chevron* directs courts to first apply the "traditional tools of statutory construction" and determine if intent is clear.  467 U.S. at 842, n.9.  There are many such tools, but prime among them is a plain text reading of the statute.  As discussed fully below, having fully considered the parties' arguments, the Court finds that Congress intended that section 20 apply only to lands held in trust.

### 1.     *The DOI's Regulations*

Much of Plaintiffs' briefing is devoted to challenging the DOI's interpretation of the phrase "in trust" as set forth in the section 20 regulations.  They do so by arguing that the BIA's new regulations are invalid and, alternatively, that the regulations are not entitled to deference.   In particular, Plaintiffs urge that DOI lacks authority to issue legislative regulations under IGRA,[14] it improperly used the rulemaking process to pull a "surprise switcheroo" during the course of litigation, it did not provide adequate notice of its changed position, and did not provide a reasoned analysis for the change.

None of these issues need be resolved here.  Even assuming, *arguendo*, the rulemaking process was somehow defective, or the regulations not entitled to deference, that would not be the end of the matter.  The final agency action here, as in *CACGEC II*, is the NIGC's approval of the SNI's gaming ordinance.  Thus, it is the validity of the NIGC's interpretation and application of section 20 that is determinative of Plaintiffs' challenge to SNI gaming on the Buffalo Parcel.

---

[14]  The DOI readily agrees and states that its regulations are interpretive, not legislative.

2.    *The Ordinance Approval*

When NIGC received the SNI's second amended gaming ordinance, it asked DOI for a description of its policy reasons for altering its position on section 20's applicability to restricted fee land.  NIGC noted that "if the Chairman is to approve the [SNI's] gaming ordinance on the grounds that section 2719 does not apply to restricted fee land, he must provide a reasoned analysis for this new interpretation."  (Docket No. 58-38, BIA-AR000034.)

The DOI responded with the Solicitor's M-Opinion.  Therein, the DOI observed that the phrase "'in trust' has a common and generally well-accepted meaning in Indian law," particularly as it relates to fee ownership.  The United States holds legal title to trust lands, while Indians are the owners of restricted fee lands.  (Docket No. 58-8 at 5-6.)  Reading "in trust" as including only those lands in which the United States has legal title and the Indian "owner" has beneficial title honors that distinction.  It also comports with the whole act rule, which assumes that Congress is internally consistent in its use of terms and phrases when drafting legislation.  The DOI expressly noted, in its final regulations, that it considered Congress's use of the term "in trust" to be purposeful "because Congress referred to restricted fee lands elsewhere in IGRA" and, so, would have included restricted fee land in section 20 if that is what was intended.  73 Fed. Reg. 29355.  The NIGC Chairman concurred, noting in his ordinance approval that section 20 "only references trust land acquired after October 17, 1988" and "I believe that the Seneca Nation's restricted fee lands do not fall within the provisions of section 2719."  (Docket No. 58-4 at 11, 20.)

In moving for summary judgment on this issue, Plaintiffs maintain that: 1) NIGC's reliance on DOI's revised position was unreasonable; 2) the Chairman considered the "in

trust" language in isolation, without regard to congressional intent; and 3) the Chairman's stated reasons for his changed position are unsupportable.  Each argument is addressed below.

Plaintiffs first urge that the Chairman should not have relied on DOI's revised position because its regulatory drafting team was tasked with devising regulations "of general applicability."  (Docket No. 58-2 at 31.)  NIGC, on the other hand, was required to consider section 20 in the "unique fact specific context" of SNSA, as former-Secretary Norton had done in 2002.  (*Id*.)  It is quite evident, on the face of the Chairman's ordinance approval, that NIGC fully considered Secretary Norton's earlier reasoning, which NIGC had previously adopted, in his analysis.  Thus, the charge of error in this regard is without merit.

In support of their second argument, Plaintiffs generally maintain the Chairman abused his discretion by failing to take into account "the language and design of IGRA as a whole, its legislative history, and the impact of SNSA on [section 20]."  (*Id*. at 32.)  They contend that former-Secretary Norton understood the necessity for such an approach when, in 2002, she concluded that Congress did not intend to limit section 20 "to only *per se* trust acquisitions" because such a construction would undermine IGRA's regulatory regime.

It is evident here that both DOI and NIGC considered the body of Indian law existing at the time of IGRA's passage and thereafter.  The DOI's M-Opinion confirms that: "[s]ince 1934, . . . the Secretary has had broad authority under the [IRA] to acquire lands . . . in trust . . . , [but] the Secretary lacks any general authority to place restrictions on lands

tribes acquire in fee."[15]  (Docket No. 58-8 at 3.)  NIGC, too, recognized this reality when it stated that "only Congress, or the Secretary acting pursuant to explicit authorization from Congress, can create restricted fee Indian land."  (Docket No. 58-4 at 20.)  The Chairman further observed that, because there was no existing mechanism for the creation of restricted fee land when IGRA was enacted, "there was no need for [Congress] to include it in the section 2719 prohibition."  (*Id*. at 20.)  He went on to conclude, however, that when it omitted restricted fee land from section 20, Congress "intend[ed] for such land to be eligible for gaming under IGRA unless [it] explicitly provides to the contrary."  (*Id*.)

It is this conclusion that Plaintiffs dispute, and they maintain the Chairman abused his discretion when he changed the position he had taken in his earlier ordinance approval. There, the Chairman had found that section 20 can only sensibly be read to include both trust land and restricted fee lands because, otherwise, tribes could avoid the prohibition against gaming by taking land into restricted fee and creating exceptions Congress likely did not intend.  (Docket Nos. 58-2 at 33; 58-7 at 4.)  Based on what he then viewed as a loophole that would permit gaming in circumstances Congress had not envisioned, the Chairman found section 20 was ambiguous, and went on to provide a "reasonable interpretation" that would resolve the perceived conflict.  (Docket No. 58-7 at 4.)  *See Brown v. Gardner*, 513 U.S. 115, 118, 130 L. Ed. 2d 462, 115 S. Ct. 552 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context").

As part of his analysis in the current ordinance approval, the Chairman revisited his

---

[15]  The M-Opinion further notes that, since IGRA's enactment, new lands for Indians have been acquired in trust.  According to DOI, the historic restricted fee lands that continue to exist are comprised of tribal lands in what were the original Thirteen Colonies, some individual allotments, and some tribal lands subject to statutory restrictions.  (Docket No. 58-8 at 6.)

previously stated concern that tribes might go out and purchase new land in fee and then claim the acquisitions are "Indian lands" eligible for gaming.  Citing *CACGEC II*, 2008 U.S. Dist. LEXIS 52395, at *135-36, the Chairman observed that "the Non-intercourse Act [§ 177] does not apply to off reservation fee land acquired by a tribe outside of Indian country,"[16] and concluded that, "therefore, there will be no sudden dramatic increase"[17] in gaming on fee lands under the new interpretation.  (Docket No. 58-4 at 14.)  The Court agrees with NIGC's statement of the law for all of the reasons set forth in *CACGEC II*.

A matter the Chairman did not discuss, but implicitly recognized, is that there are circumstances in which tribes may acquire fee land that is in "Indian country."  One question, then, is whether tribes have the potential to circumvent IGRA by acquiring such land.  The Court finds *City of Sherrill*  instructive in this regard.  544 U.S. 197.  As previously discussed, the Oneida Nation purchased land within a reservation that had never been disestablished.  The Circuit Court concluded the reacquired land was "Indian country" subject to tribal jurisdiction.  While the Supreme Court did not disturb the "Indian country" determination, it considered the equities involved in reestablishing Indian sovereignty over land that had been under state and local control for almost two centuries, and reversed on the Circuit's holding on jurisdiction.

In light of *City of Sherrill*, it seems evident that a tribe's long-dormant sovereignty is

---

[16]  In short, restricted fee status does not attach automatically to a tribe's fee purchases outside of Indian country.

[17]  Plaintiffs maintain, in their third argument, that this is an unsupportable reason for the Chairman's changed position.  The discussion that follows necessarily addresses this argument, as well.

not presumptively revived where it reacquires "Indian country."[18]  Rather, absent guiding

legislation, the question will be one for the courts and a balancing of equities will apply.

As such, the Chairman's  revised conclusion, in which he found that that IGRA's intent is

not undermined if section 20 is read to apply only to newly-acquired trust land, is neither

an abuse of discretion nor contrary to law.

Finally, Plaintiffs urge that it may be necessary, in the course of construing the

meaning of a statute, to consider the implications of a later statute.  They quote extensively

from *FDA v. Brown & Williamson Tobacco Corp.* for this proposition, and suggest the

Chairman erred when he failed to consider the impact of the later-enacted SNSA on

section 20's meaning.  529 U.S. 120, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000).

*Brown & Williamson* involved regulations promulgated by the FDA concerning the

"promotion, labeling, and accessibility to children and adolescents" of tobacco products.

*Id*. at 128.  The Court was asked to determine whether the FDA has authority, under the

Federal Food Drug, and Cosmetic Act ("FDCA"), to regulate in this area.  In discussing

statutory construction, the Court observed that an existing statute "may be affected by

other Acts, particularly where Congress has spoken subsequently and more specifically to

the topic at hand," *id*. at 132, and that "'a specific policy embodied in a later federal statute

should control our construction of the [earlier] statute, even though it has not been

expressly amended,'" *id*. at 143 (quoting *United States v. Estate of Romani*, 523 U.S. 517,

530-31,118 S. Ct. 1478, 140 L. Ed. 2d 710 (1998)).  After considering 35 years of post-

FDCA legislation, in which Congress enacted several tobacco-specific statutes and

---

[18]  Even assuming such revival were possible, the logical question is whether a historic reservation that was never disestablished would be subject to section 20 at all.

repeatedly reserved to itself exclusive policymaking authority with regard to cigarettes, the Court concluded that the FDA lacked authority to promulgate regulations regulating tobacco products.  *Brown & Williamson*, 529 U.S. at 148-55.

The present case is readily distinguished.   IGRA was enacted to establish a regulatory scheme governing the conduct of all Indian gaming.  SNSA is a later-enacted statute that is neither a statute of general applicability[19], nor one that speaks to the topic of gaming at all.  Plaintiffs do not explain how and why a statute that is directed at a single tribe and does not express any policy position on Indian gambling should have controlled the NIGC Chairman's construction of IGRA.   Here, too, the Court rejects Plaintiffs' assertions that the Chairman disregarded congressional intent in his analysis or that his reasoning is unsupportable as a matter of law.

### 3.    *The SNSA*

As Plaintiffs correctly note, the specific question of whether gaming can occur on the Buffalo Parcel does not end with the section 20 analysis.  Because a subsequent statute, SNSA, permits the SNI to acquire new "Indian lands," the Court must look to that Act to determine whether Congress also addressed the issue of gaming on such lands. In this regard, the NIGC Chairman concluded that: "if and when Congress enacts a law which allows a tribe to have restricted fee land, it intends for such land to be eligible for gaming under IGRA unless Congress explicitly provides to the contrary." (Docket No. 58-4 at 20.)

---

[19]  The Court recognized the unique attributes of SNSA's land acquisition provision in *CACGEC II* when it noted that "there appears to be no other statute then in effect or since enacted that contemplates taking land into restricted fee status."  2008 U.S. Dist. LEXIS 52395, at *128-29, n.49.

The tools of statutory construction support this view.  Courts have long assumed "that Congress is aware of existing law when it passes [new] legislation." *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32, 111 S. Ct. 317, 112 L. Ed. 2d 275 (1990) (citation omitted). Moreover, federal Indian law has been described as "a subject that cannot be understood if the historical dimension of existing law is ignored." *Sac & Fox Tribe v. Licklider*, 576 F.2d 145, 147 (8th Cir.), *cert. denied*, 439 U.S. 955, 99 S. Ct. 353, 58 L. Ed. 2d 346 (1978). Thus, it is assumed that Congress understood, when enacting SNSA, that it was authorizing the creation of "Indian lands" under IGRA, but was directing that the land be acquired in a manner not contemplated by section 20's prohibition on gaming.[20]

When Congress passes a specific, narrow statute permitting an action that is otherwise unavailable under law, any restrictions on that action must necessarily be addressed in the new statute.  As the SNI observes in its *amicus* brief, Congress has "amply demonstrated its ability" to address Indian gaming in tribe specific legislation. (Docket No. 62 at 26.)

One example is the Rhode Island Indian Claims Settlement Act, enacted in 1978 to effectuate the resolution of land claims brought by the Narragansett Tribe of Indians. §§ 1701 *et seq.*  At that time, the Narragansett Tribe was not acknowledged by the federal

---

[20]  Though it is sufficient for purposes of statutory construction to assume Congress's knowledge of existing law, the Court notes that the first Indian gaming bills introduced after the Supreme Court's decision in *Califorina v. Cabazon Band of Mission Indians*, 480 U.S. 202, 107 S. Ct. 1083, 94 L. Ed. 2d 244 (1987) (upholding sovereign right of Indians to engage in gaming on tribal lands), expressly reflect congressional understanding in this regard.  The proposed language for what is now the section 20 prohibition provided that "gaming regulated by this Act shall be unlawful on any lands acquired by the Secretary *under existing authority* in trust for the benefit of any Indian tribe after the date of enactment of this Act."  133 Cong. Rec. S 7454, S. 1303 § 4(a)(1) (emphasis supplied); *see also*, 133 Cong. Rec. H 3915 (introduction of identical H.R. 2507).  The fact that the emphasized language does not appear in the final  statute does not negate Congress's understanding that the sole existing authority for creating new "Indian lands" was through the IRA's trust provision and that section 20 is directed solely to that circumstance..

government, and so the settlement lands were to be acquired, held, and managed by a state corporation. §§ 1706, 1707(c).  The Tribe received federal recognition in 1983, and thereafter requested that the Secretary take the settlement lands into trust.  *Carcieri v. Salazar*, 555 U.S. at 384-85.  In 1996, Congress amended the Settlement Act to provide that: "[f]or purposes of the Indian Gaming Regulatory Act . . ., [Narragansett] settlement lands shall not be treated as Indian lands." § 1708.  In short, even assuming the Secretary's trust acquisition fell within a section 20 exemption or exception, no gaming could occur there.  *See also*, Alabama Coushatta Restoration Act, § 737(a) (1987 (pre-IGRA)) ("All gaming activities which are prohibited by the laws of the State of Texas are hereby prohibited on the reservation and on lands of the tribe.").

Similarly, where, as in SNSA, Congress provides for the creation of new "Indian lands" in a manner not contemplated in section 20, the land is gaming eligible under IGRA unless Congress provides otherwise.  There is no such statement of intent in SNSA, express or implied, nor has Congress acted, in the many years this dispute has been pending, to limit gaming on land acquired with SNSA funds.

## D.    The Issue of Whether a section 20 Exception Applies is Moot

In *CACGEC II*, the Court accepted the position taken by Defendants in that litigation—*i.e.*, that restricted fee land falls within the section 20 prohibition and also its exceptions.[21]  It therefore went on to consider whether, as Defendants claimed, the Buffalo Parcel falls within an exception which would allow gaming.  Specifically, Defendants had argued that SNSA settled an SNI land claim and that the Buffalo Parcel, purchased with

---

[21]  Plaintiffs agreed that restricted fee lands were included in the prohibition, but argued that the same phrase—"in trust"—had a different meaning for purposes of the exceptions.

SNSA funds, was therefore acquired "as part of a settlement of a land claim." § 2719(b)(1)(B)(I).  The Court concluded the Buffalo Parcel did not fall within the settlement of a land claim exception.

At that time, there was no regulatory definition of "land claim" in effect.  The Court, in concluding SNSA did not settle a "land claim," applied what it found was the least restrictive definition of the term Congress could have intended—*i.e.*, the possession of an enforceable right to relief against the United States, whether or not that right had ever been asserted.  2008 U.S. Dist. LEXIS 52395, at *186.  The parties agreed that any enforceable right against the United States relating to the SNSA land leases would have arisen from the Nonintercourse Act.  *Id*. at 189.  But, as fully discussed in *CACGEC II*, prior to the SNI's negotiation of the 99-year leases discussed in SNSA, Congress had expressly authorized the SNI to negotiate its Salamanca leases without the need for formal treaty or convention, thereby taking the land outside the Nonintercourse Act, 25 U.S.C. § 177.  *Id*. at 191-202.  In short, the Act could not be the source of an enforceable right giving rise to a land claim.

The BIA's final regulations now define a "land claim" as:

> any claim by a tribe concerning the impairment of title or other real property interest or loss of possession that:
> (1) Arises under the United States Constitution, Federal common law, Federal statute or treaty;
> (2) Is in conflict with the right, or title or other real property interest claimed by an individual or entity (private, public, or governmental); and
> (3) Either accrued on or before October 17, 1988, or involves lands held in trust or restricted fee for the tribe prior to October 17, 1988.

25 C.F.R. § 292.2.  The regulations further provide that the "settlement of a land claim" exception applies if the land at issue is:

> [a]cquired under a settlement of a land claim that resolves or extinguishes with finality the tribe's land claim in whole or in part, thereby resulting in the

alienation or loss of possession of some or all of the lands claimed by the tribe, in legislation enacted by Congress.

25 CFR 292.5

In his most recent ordinance approval, the Chairman acknowledges that "NIGC is bound by [the *CACGEC II*] decision unless it is overturned on appeal." (Docket No. 58-4 at 20.)  He opines, nonetheless, that, if the Court were to reject the government's revised interpretation of the section 20 prohibition, the Buffalo Parcel's acquisition "would meet the requirements of section 2719's settlement of a land claim exception under the new regulations." (*Id*. at 21.)  Plaintiffs' third claim for relief is directed to this statement.

The Court has thoroughly reviewed the arguments presented by the parties and *amicus*.  It finds, however, that further analysis of this issue is neither necessary nor instructive to the resolution of this action.  Having concluded that section 20's intent is clear and that the SNI's newly-acquired restricted fee lands are not subject to the prohibition at all, Plaintiffs' third claim for relief is denied as moot.


## IV.  CONCLUSION

For the reasons stated, Plaintiffs' motion is denied in its entirety and this case is dismissed.


## V.  ORDERS

IT HEREBY IS ORDERED that Plaintiffs' Motion for Summary Judgment (Docket No. 58) is DENIED.

FURTHER, that the Clerk of the Court is directed to enter Judgment in favor of Defendants and to close this case.

SO ORDERED.

Dated:      May 10, 2013
            Buffalo, New York


                                        _____/s/William M. Skretny_____
                                                  WILLIAM M. SKRETNY
                                                      Chief Judge
                                              United States District Court